# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 3, 2004

## STATE OF TENNESSEE v. JIMMY W. ROGERS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-466     Carol Soloman, Judge**

---

**No. M2003-00381-CCA-R3-CD - Filed February 24, 2004**

---

Following a jury trial, the Defendant, Jimmy W. Rogers, was convicted of aggravated assault. In this direct appeal, he raises the following issues: (1) whether the trial court erred by refusing to allow him and a co-defendant to compare jury strikes; (2) whether the trial court erred by admitting a video tape and an audio tape into evidence; (3) whether the trial court erred by denying him discovery of the victim's medical records; (4) whether the trial court erred by refusing to grant him a continuance; (5) whether the trial court erred by limiting his cross-examination of the victim; (6) whether the trial court erred by refusing to grant a mistrial based on improper comments by the prosecutor during closing argument; (7) whether the trial court erred in its jury instruction; (8) whether the trial court improperly sentenced the Defendant; and (9) whether the trial court erred by refusing to suspend the Defendant's sentence pending the appeal. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Lance B. Mayes, Nashville, Tennessee, for the appellant, Jimmy W. Rogers.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Amy Eisnbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On August 19, 2001, Gerald Puttman was working at Jack Russell's restaurant in Nashville. He clocked out at 10:18 p.m., and he drank one beer with the bartender. He then left the restaurant in his 1993 Ford Bronco. He said that as he was driving home, he pulled up to a stop sign behind a new Lexus automobile. Although no cars were coming, the Lexus remained at the stop sign in

front of Mr. Puttman. Mr. Puttman flashed his headlights at the Lexus, and the car moved up a few feet, then stopped. Daniel Ivy, the co-defendant in this case, was sitting in the left rear seat of the Lexus. Mr. Puttman testified that Mr. Ivy leaned out the window, screamed at him, and raised his middle finger.[1] Mr. Puttman then pulled around the Lexus, which accelerated to pull beside Mr. Puttman's vehicle. When Mr. Puttman stopped at a red light, Mr. Ivy got out of the Lexus, ran toward Mr. Puttman's truck, and yelled, "come back, I am going to f--k you up." Mr. Puttman described Mr. Ivy as "enraged," and Mr. Puttman was "pretty scared." Mr. Puttman was able to turn right and accelerate down the road. He looked in his rearview mirror and saw the Lexus following him. The Lexus began flashing its headlights, and Mr. Ivy was "hanging out the left side of the car yelling." The Lexus attempted to pass, but Mr. Puttman kept positioning his car so that it could not get around him. Mr. Puttman was becoming more frightened, and he ran three red lights because he did not want to stop with the Lexus behind him. Eventually the Lexus pulled alongside Mr. Puttmans's truck, and he saw the Defendant, who was driving the Lexus, "flexing his muscle" and "pounding his fist into his hand, like I am going to hurt you."

Mr. Puttman decided to go to Southern Hills Medical Center in an attempt to find a safe place. The Lexus followed. He went to the emergency room entrance, but the door was locked. He pressed the call button, but no one answered. The Defendant and Mr. Ivy spotted him, and Mr. Ivy ran up to him and hit him in the right side of the head. Then the Defendant got out of the car, and the two of them proceeded to strike Mr. Puttman in the head and abdomen with their fists. Mr. Puttman fell to the ground, and the two men continued to beat and kick him. Eventually a state trooper came out of the hospital and stopped the beating.

Mr. Puttman testified that the injuries he sustained included a large portion of skin on his ear being ripped loose, a sore jaw that "popped" for several months, and general pain in his head and abdomen. He had deep bruises and abrasions from the beating. He was given pain medication at the emergency room, and the pain lasted for several weeks. For approximately eight months he experienced double vision when he focused on a distant object. He also said that he had lost approximately fifty pounds since the incident and was suffering from anxiety and depression.

Tennessee Highway Patrol Officer Angela Bain-Silva testified that, on August 19, 2001, she was at Southern Hills Hospital at approximately 10:00 p.m. While she was there, she heard a buzzing noise which the medical staff advised was the "ambulance buzzer" at the back door. She looked at a monitor that showed activity at that door and saw two men and a woman kicking a man who was on the ground. Officer Bain-Silva went out the back door and found Mr. Puttman on the ground with the Defendant and Mr. Ivy on top of him, beating him. When she yelled for them to stop, Mr. Puttman went to her right, and the defendants went to her left. She testified that Mr. Puttman was bleeding from the side of his head. She also said that she smelled alcohol on both the Defendant and Mr. Ivy. The officer testified that the Defendant and Mr. Ivy were arrested after it

---

[1] In Tennessee, raising one's middle finger is generally understood to be an offensive gesture that expresses disrespect.

was determined that there was a video tape taken by hospital security cameras that showed them beating Mr. Puttman.

Trooper Bain-Silva testified that the Defendant was calm once she put an end to the assault. He handed her his phone, and Metro dispatch was on the line. She advised the dispatcher that she needed Metro police to assist her. The Defendant then told her that Mr. Puttman had run him off the road. Although she could tell he had been drinking, she did not believe he was intoxicated.

Melissa Ivy, Daniel Ivy's wife, testified that she was riding in the Lexus on the night in question. She said that, after Mr. Puttman pulled behind them in his Bronco at the stop sign, he flashed his lights three times. The Defendant "started to go," but a car was coming, so he stopped again. She said that Mr. Puttman then came beside them and "pushed us over trying to get into the right lane." She stated that they "hit the curb," and Mr. Puttman "honked and flipped us off and went on." At that point, she said the Defendant dialed 911 and followed Mr. Puttman to get his license plate number. She said that during the ensuing chase, Mr. Puttman was cutting them off, motioning to them with his arm, and yelling at them. She insisted that Mr. Ivy never got out of the Lexus.

They followed Mr. Puttman to the hospital, where they pulled behind his truck to get the license number. They saw Mr. Puttman at the back door of the hospital, and Mr. Ivy walked toward him. The Defendant then got out of the car and joined Mr. Ivy. Mrs. Ivy testified that she did not remember anything about the fight itself. However, she did remember that when Trooper Bain-Silva came out of the hospital and broke up the fight, Mr. Puttman "charged at" the Defendant.

Daniel Ivy testified that Mr. Puttman forced the Lexus into the curb at the stop sign. He said that everyone in the car was "really scared." The Defendant called 911 and followed Mr. Puttman to get his tag number. Mr. Ivy said that he advised the Defendant "to go around him, you know, to try to stop him." Mr. Ivy testified that they never yelled at Mr. Puttman or made any obscene gestures to him, and he never got out of the car.

At the hospital, they parked at the ambulance entrance, and Mr. Ivy got out to get the license plate number on Mr. Puttman's Bronco. He testified that Mr. Puttman pointed at him, "yelling and cussing," saying, "you punks are in trouble." Mr. Puttman then pushed Mr. Ivy, and Mr. Ivy pushed back. Mr. Puttman then "came at [him]" and "started hitting [him]." Mr. Ivy hit back, but then fell down. Then the Defendant approached, and he and Mr. Puttman began to fight. Mr. Ivy unsuccessfully tried to pull the two apart, and then the state trooper came through the hospital door and the altercation ceased.

On appeal,[2] the Defendant complains that the trial court erred by preventing the co-defendants from comparing jury strikes during voir dire. The Defendant fails to refer us to any point in the record reflecting that the trial court refused to allow the co-defendants to compare jury strikes. "Issues which are not supported by argument, citation to authorities, or appropriate references to the

---

[2] We do not address the issues in the same order in which they are presented in the Defendant's brief.

record will be treated as waived in this court." Tenn. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7), (g). Therefore, this issue is waived.

Second, the Defendant argues that the trial court erred by admitting into evidence the hospital video tape that depicts the attack on Mr. Puttman and the tape recording of the 911 call made by the Defendant. Again, the Defendant fails to refer us to any point in the record in support of his argument. The Defendant's brief is inadequate to allow a meaningful review of the issue he attempts to assert as error on appeal. Therefore, the issue is waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g).

As a separate issue, the Defendant argues that the trial court erred by admitting the audio tape of the 911 call without instructing the jury as to the "context" of the statements that were made on the tape. Because the Defendant fails to cite to the record in his argument or explain what he meant by "context," this issue is waived.[3] See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g).

The Defendant complains that the trial court erred by denying his motion to compel discovery of the victim's medical records. First, the Defendant again fails to cite to the record or to any relevant authority in his argument on this issue. Therefore, this issue is waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g). Furthermore, the Defendant fails to explain how he was prejudiced by the exclusion of the medical records. The victim testified at trial regarding the nature and cause of his prior injuries, which were exacerbated by the assault.

The Defendant also argues that the trial court erred by not granting him a continuance for the purpose of subpoenaing doctors who treated the Defendant before and after the attack. The Defendant fails to cite to any point in the record where he requested and was denied a continuance. Therefore, this issue is waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g). Moreover, the Defendant fails to even suggest what the testimony of the doctors would have been or how he was prejudiced by not being allowed to offer their testimony.

The Defendant also contends that the trial court erred by limiting his cross-examination of the victim at trial and at the sentencing hearing. The defense attorney attempted to cross-examine the victim regarding prior medical issues. First, the victim testified at trial that he had experienced ringing in his ears since the assault. The defense attorney then asked, "if someone as far as medical personnel did not put down the ringing of your ear, that would be an inaccurate statement?" The trial court ruled that the defense attorney's question was improper. Second, the attorney for the defendant asked whether the victim was released from his employment as a fireman because of his depression. Again, the trial court ruled that the question was improper. Finally, at the sentencing hearing, the victim testified that six to eight months before the assault, some "personal issues" in his life had

---

[3]The record reflects that the tape contained a 911 call placed by the Defendant while he was chasing Mr. Puttman. Audible on the tape are various comments made by the occupants of the Lexus. Apart from this, we do not know of any other "context" to which the Defendant may be referring.

caused him "some depression." The defense attorney then asked, "And these prior issues in your life, what were they?" The trial court ruled that the question was irrelevant.

The propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. See State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994). We cannot conclude that the trial court abused its discretion by limiting cross-examination in the instances cited by the Defendant. With respect to the first question, the attorney was apparently attempting to impeach the victim with a prior inconsistent statement. The question implied that the attorney had a copy of a report which made no mention of the victim experiencing a ringing in his ears. The record does not indicate that such a report was made, and no medical personnel testified that the victim did not mention a ringing in his ears. Given the absence of any foundation for the impeaching question, we do not believe that the trial court abused its discretion by finding it improper. Moreover, even if the court erred, the Defendant fails to show how he was prejudiced by it.

The trial court also ruled that the reason for the victim leaving his job as a fireman was improper. The question was irrelevant in that it did not make it more or less probable that the Defendant committed an aggravated assault on the victim. See Tenn. R. Evid. 401. Furthermore, the victim testified that he was not fired from the fire department due to depression. Rather, he voluntarily left the fire department when he was offered a job working in a restaurant.

Finally, the trial court did not allow the defense to question the victim regarding "prior issues" that had caused him some depression before the assault. The court ruled that, while the prior depression itself may be relevant to show that the attack alone was not responsible for the victim's mental state, the cause of the prior depression was irrelevant. We agree. This issue is without merit.

Next, the Defendant contends that the trial court erred by refusing to grant a mistrial after the prosecutor made inappropriate statements during closing argument. Not only does the Defendant fail to cite to the record in his argument on this issue, he does not articulate, even in general terms, the nature of the prosecutor's statements he found objectionable. Accordingly, this issue is waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g).

The Defendant maintains that the trial judge erred when, after the defense attorney requested a jury instruction on defense of a third person, she said, "you still wanted that? You said you were going to let me know. It doesn't seem to be relevant. Do you think you want it read for the jury to consider? All right." The Defendant concedes that he failed to enter a contemporaneous objection to the judge's remark, which effectively waives the issue on appeal. See Tenn. R. App. P. 36(a). However, he urges us to consider this issue as plain error.

This Court considers five factors when determining whether an error constitutes "plain error":

> a) the record must clearly establish what occurred in the trial court;
> b) a clear and unequivocal rule of law must have been breached;
> c) a substantial right of the accused must have been adversely affected;

d) the accused did not waive the issue for tactical reasons; and

e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). The record clearly reflects that the trial court did comment that the instruction on defense of a third person seemed to be irrelevant. Article VI, section 9 of our state constitution prohibits trial judges from commenting on the evidence in a case. "[T]rial judge[s] must be very careful not to give the jury any impression as to [their] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989). However, in this case, the Defendant has failed to convince us that substantial justice requires that we consider the error. Accordingly, we decline to find "plain error."

The Defendant challenges the sentence imposed by the trial court. However, once again, he fails to cite to the record in his argument. Therefore, the issue is waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g).

Finally, the Defendant argues that the trial court erred by refusing to suspend his sentence pending the instant appeal. First, the Defendant fails to cite to a point in the record where he requested and was denied a suspension of his sentence. The issue is accordingly waived. See Tenn. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7), (g). Furthermore, the Defendant presents this issue as a request for an extraordinary appeal under Tennessee Rule of Appellate Procedure 10. However, the record does not indicate that the trial court entered an interlocutory order from which a Rule 10 appeal would lie. A defendant seeking review of an appeal bond issue must pursue his or her appeal under Rule 8 of the Tennessee Rules of Appellate Procedure, which the Defendant has not done. The Defendant requests a "stay" pending appeal, but the Advisory Commission Comment to Tennessee Rule of Appellate Procedure 7 states "Nothing in this or any other of these rules governs the availability of stays in criminal actions. Release orders of the trial court may be reviewed as provided in Rule 8 of these rules." In addition, the Defendant in his brief acknowledges that by the time the appeal herein is completed, this issue will be moot. The Defendant is entitled to no relief on this issue.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE